TERRANCE EMMONDO KENNEDY, a Minor, by Cathy Davis, his Mother and Next Friend, Plaintiff-Appellant, *v.* MAEBELL KENNEDY, Adm'x of the Estate of Benjamin Kennedy, Deceased, Defendant-Appellee.

First District (2nd Division)   No. 80-443

Opinion filed February 3, 1981.

---

David G. Wilkins, of Evanston, and James Sulzer, of Stiller & Strauss, of Chicago, for appellant.

David R. Herzog, of Layfer, Cohen, Handelsman & Mora, Ltd., and Mordecai M. More, both of Chicago, for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Petitioner Terrance Kennedy, by his mother Cathy Davis, brought this action in the circuit court of Cook County to amend the order of heirship of decedent Benjamin Kennedy's estate. Following Benjamin Kennedy's death at age 27, his mother Maebell Kennedy was appointed administratrix of his estate. The heirship order was entered on August 16, 1979. Decedent's personal estate was valued at approximately $13,193. On November 9 of that year, Cathy Davis petitioned the probate court to amend the heirship order. The petition alleged that Maebell Kennedy, as administratrix, had failed to include Davis' child Terrance, son of decedent, on the heirship list. The petition also stated that the administratrix had not given Terrance notice of the pending heirship proceeding even though she was aware of the existence of the possible claim.

At the hearing on the motion to amend the heirship list, the following testimony was adduced. Mary Jacobs, the medical records clerk at St. Francis Hospital in Evanston, presented a document which contained a signed acknowledgement by Benjamin Kennedy of his paternity of Terrance Kennedy. Jacobs testified that this record was kept by the hospital in the ordinary course of business, and that since the time of its com-

pletion, it had been retained in the custody of the hospital. She also identified the document as the original record. The document, dated July 18, 1977, was then admitted in evidence.

The second witness was Cathy Davis. She identified herself as the mother of Terrance Kennedy. She testified that she first met Benjamin Kennedy in 1973 and moved in with him in 1975, remaining with him until the time of his death. Terrance was born on July 14, 1977, at St. Francis Hospital in Evanston. Davis asserted that decedent was Terrance's father and that she had not had sexual intercourse with anyone other than decedent during her 6-year relationship with decedent. At this point a document entitled "Certificate of Live Birth" was introduced as evidence. The document recorded the baby's name as Terrance Emmondo Kennedy and the father's name as Benjamin Gibson Kennedy.

Davis also testified that while she was in the hospital following Terrance's birth, she spoke to decedent, both on the phone and during his visit to the hospital, discussing the naming of the baby and decedent's father's recent death. Davis stated that while she lived with decedent he paid her expenses before and after the child's birth, and that decedent had spoken of covering the child on his insurance policy. She also testified that the child's first birthday was celebrated at decedent's mother's home (the administratrix in this proceeding). The child received gifts from decedent's family on that occasion and at Christmas. Davis testified that, after his father's death, Terrance began receiving social security benefits as Benjamin Kennedy's dependent.

On cross-examination, Davis admitted that she had visited Atlanta prior to the child's birth and that she knew a man named Carl in Evanston. She denied, however, that she had had sexual relations with anyone other than decedent from 1973 to 1977. No date or month of her visit was established.

Petitioner called Maebell Kennedy to testify as an adverse witness. She testified that during her visits to her son's home, he was alone. She knew that Davis lived with him in 1973, but denied that they had cohabited in 1974 or 1975. Although Davis brought Terrance to her home, Maebell Kennedy denied giving him presents. She also denied initiating any phone conversations with Davis.

Following her examination as an adverse witness, Maebell Kennedy remained on the stand to testify on behalf of the estate. She alleged that Davis had told her that she, Davis, had gone to Atlanta in October of 1976, and had met a man there. At the same time, Davis was dating a man in Evanston known as Carl. Maebell Kennedy admitted, however, that although she was sure that Davis had been "seeing" men other than Benjamin Kennedy, she did not know if Davis had had sexual relations with them. The testimony continued:

"Q. When she returned, did you learn—how did you learn that she was pregnant?

A. Through by Ben, a couple of months after she returned from Atlanta.

Q. What did the deceased tell you about that?

A. He said, 'Mama, Cathy told me she was pregnant, but I know it is not mine.'

\* \* \*

Q. Who was saying it was his? Who was saying that the child was his?

A. Cathy was saying it was his.

Q. And as the birth date of the child approached, did he continue to maintain that he knew she was pregnant but that it was not his son?

A. He always did. That is all he ever said."

Maebell Kennedy testified that on July 18, Cathy called Benjamin Kennedy and told him to come to the hospital and sign papers. He did not want to go and was "all upset." In the ensuing months, decedent maintained that the child was not his "all the time, every time \* \* \* that is all he ever said." Maebell Kennedy also testified that her son was hardly ever with Cathy Davis because he "never did want to be bothered with Cathy." According to her testimony, her son never acknowledged the child to her as his true and natural son. On cross-examination, Maebell Kennedy admitted that she knew that if Terrance's heirship was not established, she would get decedent's property.

Kirk Kennedy, decedent's brother, testified that he lived with decedent in September of 1977, and that decedent was not sleeping with anyone at that time. He also testified that decedent had stated to him that Terrance was not his son. Another brother, Audrey Carr, testified that decedent had told him the baby "could not be his." On cross-examination Carr stated, "I have been to their [Davis' and decedent's] house, you know, I have been by there, and they have been over to my house."

Following the testimony and arguments of counsel, the trial judge stated: "The court finding is that that quantity of evidence necessary to clearly convince the trier of the facts that heirship, previous heirship, should be vacated has not been adduced." He then denied the petition to amend the heirship order. The present appeal followed. On appeal petitioner's essential contention is that the finding of the trial court that sufficient evidence had not been produced to establish paternity was in error.

■■■ As the above facts demonstrate, the only corroborated testimony was that of Cathy Davis. While we acknowledge that demeanor is important in evaluating a witness' testimony, the trial court's discrediting of petitioner's evidence as insufficient to establish paternity is unwar-

ranted here. (See generally *People ex rel. Gomez v. Wedech* (1978), 58 Ill. App. 3d 518, 521, 374 N.E.2d 849.) Although interested parties are no longer barred by the "Dead Man's Act" from testifying to any fact relating to the heirship of a decedent (see 1 Horner, Probate Practice and Estates §205, at 363 (4th ed. 1976)), it is well settled that "courts lend an unwilling ear to testimony by interested persons as to what a dead person has or has not said, and such evidence [should] be carefully scrutinized as well as considered with all the other evidence in the case." (*Naden v. Naden* (1976), 37 Ill. App. 3d 571, 574-75, 346 N.E.2d 202; *cf. Foulkes v. Chicago Title & Trust Co.* (1935), 283 Ill. App. 142, 161 (value of pedigree evidence stems from its being drawn from an unbiased source).) In the instant case the only evidence which can be considered free from self-serving interests is the document executed by Benjamin Kennedy. Written documentary evidence, particularly where corroborated by testimony, has always been accorded particular reliability and credibility. (See *In re Estate of Wetstone* (1946), 329 Ill. App. 533, 69 N.E.2d 713 (abstract).) The execution of a written acknowledgement of paternity, in addition to Davis' uncontradicted testimony that she had sexual relations with decedent and only decedent during the period of conception, provides convincing and substantial proof of Terrance's relationship to decedent. (See also *Collins v. Collins* (1977), 47 Ill. App. 3d 258, 265, 361 N.E.2d 787; *Racky v. Racky* (1972), 5 Ill. App. 3d 1084, 1087, 284 N.E.2d 425.) It is equally manifest that Maebell Kennedy's testimony that Cathy was "seeing" other men falls far short of proof of sexual relations with men other than decedent. (See *People ex rel. Walsh v. Kilbride* (1974), 16 Ill. App. 3d 820, 823, 306 N.E.2d 879; *People ex rel. DeCamp v. Kirk* (1921), 223 Ill. App. 362, 364.) Although Davis admitted going to Atlanta prior to the baby's birth, she was never asked the actual or even approximate time of this visit. Maebell Kennedy did testify that the visit took place in October but never specified the length or exact time of the visit. In conclusion, the only testimony offered which contradicted Davis' proof of paternity was that in which decedent was purported to have orally denied paternity to family members. Aside from the questionable weight to be accorded this self-serving hearsay testimony by parties whose interests were decidedly adverse to those of petitioner, the statements were contradicted by decedent's own written acknowledgement of paternity. (*Cf. Hall v. Gabbert* (1904), 213 Ill. 208, 214-15, 72 N.E. 806 (had defendant doubted his paternity he would not have acknowledged child as his own).) A written admission of paternity is eminently admissible and probative as proof of paternity. (See generally *Miene v. People ex rel. Olsen* (1891), 37 Ill. App. 589, 590.) The value of this documentary evidence was suggested in *Trimble v. Gordon* (1977), 430

U.S. 762, 52 L. Ed. 2d 31, 97 S. Ct. 1459, the landmark case which paved the way for inheritance by illegitimates:

"Evidence of paternity may take a variety of forms, some creating more significant problems of inaccuracy and inefficiency than others. The States, of course, are free to recognize these differences in fashioning their requirements of proof. Our holding today goes only to those forms of proof which do not compromise the States' interests. *This clearly would be the case*, for example, *where there is a* prior adjudication or *formal acknowledgement of paternity*." (Emphasis added.) (430 U.S. 762, 772 n.14, 52 L. Ed. 2d 31, 41 n.14, 97 S. Ct. 1459, 1466 n.14.)

See also *Miller v. Pennington* (1905), 218 Ill. 220, 225-26, 75 N.E. 919.

■■ Although petitioner has asked this court to decide whether a written acknowledgement of paternity is itself conclusive proof of paternity (compare *Welch v. Worsley* (1928), 330 Ill. 172, 213-14, 161 N.E. 493 (contemporaneous documentary evidence overwhelms oral testimony of 17 witnesses) with *Walsh v. Kilbride*, at 823 (acknowledgement is not a judicial admission and is therefore not conclusive)), we need not consider that issue. The proof offered by petitioner,[1] by way of testimonial and documentary evidence, was uncontradicted by any disinterested witness. Indeed, the testimony of Carr, decedent's brother, acknowledged that decedent and Davis lived together prior to Benjamin Kennedy's death. Thus this court is presented with a signed and witnessed admission of paternity, corroborative testimony by the child's mother, general recognition of the existence of an intimate relationship between the child's mother and decedent both before and after the child's birth, and a birth certificate registering the child in decedent's family name and identifying decedent as the father of the child. (See generally *In re Estate of Larimore* (1978), 64 Ill. App. 3d 470, 471, 381 N.E.2d 76; *In re Estate of Waszkiewicz* (1963), 42 Ill. App. 2d 49, 64-65, 191 N.E.2d 391.) Our scope of review in a case such as this is narrow, extending simply to whether the finding of the trial court is against the manifest weight of the evidence. (*Morelli v. Battelli* (1979), 68 Ill. App. 3d 410, 411-12, 386 N.E.2d 328; *cf. In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 13-14, 398 N.E.2d 198 (discussing "clear and convincing" evidentiary standard).) As the foregoing discussion demonstrates, the decision of the trial court was manifestly against the weight of the evidence and must be reversed. *Cf. In re Estate of Moran* (1978), 67 Ill. App. 3d 576, 582, *aff'd* (1979), 77 Ill. 2d 147, 395 N.E.2d 579 (petitioner failed to prove survivorship; trial court's

---

[1] Additional support for petitioner's claim is provided by *Hobson v. People ex rel. Druhm* (1897), 72 Ill. App. 436, 439 (discussion with putative father of name for child found probative of paternity).

amendment of heirship table reversed as manifestly against weight of the evidence).

For the foregoing reasons, we reverse and remand and direct the trial court to enter judgment consistent with this opinion.

Reversed and remanded with directions.

DOWNING and PERLIN, JJ., concur.